**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**Michael W. BERGER, Defendant–Appellant,**

**Manhattan Investment Fund Ltd. and Manhattan Capital Management, Inc., Defendants.**

**Docket No. 01–6254.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 25, 2002.

Decided: Feb. 27, 2003.

Darren T. Kaplan (Donald Joseph Cayea, on the brief), Brand, Cayea & Brand,

LLC, New York, NY, for Defendant–Appellant.

Eric Summergrad, Deputy Solicitor (Giovanni P. Prezioso, General Counsel, and Leslie E. Smith, Senior Litigation Counsel, on the brief), Securities and Exchange Commission, Washington, DC, for Plaintiff–Appellee.

Before: VAN GRAAFEILAND, JACOBS and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

The Securities and Exchange Commission ("SEC") filed this action against Michael W. Berger in the United States District Court for the Southern District of New York, alleging that Berger violated numerous anti-fraud provisions of the federal securities laws. The District Court (Denise Cote, *Judge*) granted summary judgment in favor of the SEC. On appeal, Berger challenges only the District Court's ruling that it had subject matter jurisdiction over the claims against him. The SEC asserts that Berger, who has fled the United States and is now a fugitive from justice, should be estopped from bringing the instant appeal by the fugitive disentitlement doctrine.

## BACKGROUND

We assume familiarity with the District Court's opinion, which sets forth the factual background in detail. *SEC v. Berger,* 244 F.Supp.3d 180, 183–88 (S.D.N.Y.2001). Accordingly, we need only restate those facts particularly relevant to this appeal.

1. The strategy of short selling "involves the 'sale of a security that the seller does not own or has not contracted for at the time of sale, and that the seller must borrow to make deliv-

Defendant Michael W. Berger, along with two close friends as partners, formed an offshore investment company known as the Manhattan Investment Fund, Ltd. ("the Fund"), which was organized under the laws of the British Virgin Islands and commenced trading operations in the Spring of 1996. The Fund was designed for foreign investors and tax-exempt domestic investors; its investment objective was to achieve capital appreciation by investing primarily in publicly-traded securities. Berger is the Fund's only active director.

At the time the complaint was filed, the Fund had approximately 280 investors, only a small percentage having addresses in the United States. Manhattan Capital Management, Inc. ("MCM") served as the investment advisor to the Fund and was paid an annual management fee of 1% of the Fund's net asset value as well as an incentive fee equal to 20% of the Fund's net gains. At all relevant times, Berger was the sole officer of and shareholder in MCM, a Delaware corporation headquartered in New York.

The Fund maintained a brokerage account at Financial Asset Management, Inc. ("FAM"), a broker-dealer located in Columbus, Ohio. FAM cleared all of its transactions through Bear Stearns Securities Corporation ("Bear Stearns"), which is located in New York City. At all relevant times, the majority of the Fund's assets and securities were held in the Bear Stearns account.

Berger invested the Fund's assets in stocks on domestic securities exchanges, employing the risky strategy of "short selling." [1] Using this strategy, the Fund suf-

ery.' " *Gurary v. Winehouse,* 235 F.3d 792, 795 n. 2 (2d Cir.2000), *cert. denied,* 534 U.S. 826, 122 S.Ct. 66, 151 L.Ed.2d 33 (2001) (quoting Black's Law Dictionary 1339 (7th

fered in excess of $300 million in losses between 1996 and 2000. Rather than reporting these losses, Berger, working in New York, created fraudulent account statements that vastly overstated the market value of the Fund's holdings. These statements were forwarded from New York by Berger, acting on behalf of MCM, to Fund Administration Services (the "Fund Administrator") in Bermuda every month for thirty-nine months. Although the Fund Administrator also received accurate account statements directly from Bear Stearns, Berger instructed the Administrator to ignore the Bear Stearns statements, claiming that they did not fully and accurately reflect the Fund's entire portfolio. Accordingly, the Fund Administrator relied upon the fraudulent statements created by Berger in New York to calculate the net asset value of the Fund each month. These overstated calculations were reflected in the Fund's monthly account statements, which the Fund Administrator sent from Bermuda to investors, and in the Fund's annual financial statements, which were created at MCM's offices in New York and made available for potential investors to review. Berger also arranged for these false reports to be sent to the Fund's auditors, Deloitte & Touche, which issued unqualified opinions on the Fund as a result of these false statements.

In telephone calls to the Fund Administrator on January 11 and 12, 2000, Berger revealed that he had made serious mistakes, that his calculations were based on misrepresentations, and that the Fund had suffered substantial losses. On January 14, 2000, Berger sent a letter to all shareholders in the Fund, stating that "the financial statements of the Fund that have been distributed over the last several years have been inaccurate" and that "the Fund's actual net assets are substantially less than those previously reported."

Four days later, on January 18, 2000, the SEC brought this civil action against Berger, MCM, and the Fund, alleging violations of various provisions of the federal securities laws, including section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and section 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6.

In August 2000, a criminal proceeding was commenced against Berger in the Southern District of New York, and on November 27, 2000, Berger pleaded guilty to securities fraud charges under Section 10–b and Rule 10b–5. During the plea allocution, Berger admitted to the relevant misconduct described above. Specifically, he stated under oath:

> [B]etween 1996 and 2000, I was the sole principal of Manhattan Capital Management, which acted as investment manager for an offshore fund called Manhattan Investment Fund. The fund had a contrarian strategy and was buying and selling short stocks. I believed, starting in late 1996, that the market and in particular technology stocks and Internet-related stocks were grossly overvalued, and at this point, the market turned against me and caused the fund to incur significant losses.
>
> For a variety of reasons, I was unable and not capable to admit the amount of

---

ed.1999)). This strategy is premised upon the belief that the investor will be able to buy the stock in the future for less money than the price at which he or she sold short. Berger chose this investment strategy because he be-

lieved that the stock market in general, and particularly technology stocks, were overvalued. Because the stocks he sold short continued to climb in value, however, the Fund suffered substantial losses.

those losses, and caused others to issue misleading statements to investors.

Tr. of Plea Allocution, Nov. 27, 2000, at 21. When asked by the District Court whether "some of these acts [were] committed by [him] here in New York or in [the Southern District], or were ... caused to be committed by [him] in this district," Berger replied, "[t]hey were caused to be committed by me in this district, yes." *Id.* at 22. At the plea hearing, the Assistant United States Attorney stated that, if the case went to trial,

> [t]he government would show that Mr. Berger ran a hedge fund called The Manhattan Investment Fund, primarily through an investment company called Manhattan Capital Management, which was located ... in Manhattan.
>
> He started selling shares in the hedge fund in or about April of 1996 and over the years received over $575 million from investors, nearly all of whom were overseas individuals or entities.
>
> After a few months, in 1996, however, Berger began losing large sums of money in the market, primarily by pursuing a strategy of short-selling technology and Internet-related stocks.
>
> In or about September of 1996, Berger began falsifying the hedge fund in information that he provided to the administrator and auditor to conceal the fund's losses. He caused false statements to be sent to the administrator and auditors, and the investors in return received statements from the administrator that falsely represented the value of their shares in the fund.

*Id.* at 23–24. When Berger was asked by the Court whether he "agree[d] with what the government has said with regard to the evidence that it would produce at a trial against [him]," he replied "[y]es." *Id.* at 24–25. On September 24, 2001, Berger filed a motion to withdraw his guilty plea,

which the District Court (Victor Marrero, *Judge*) subsequently denied. *See United States v. Berger,* 188 F.Supp.2d 307, 311 (S.D.N.Y.2002).

Based largely on the facts stipulated to by Berger under oath during his plea allocution, the SEC filed a motion for summary judgment in the instant case on July 20, 2001. In opposing the motion, Berger argued, among other things, that the District Court lacked subject matter jurisdiction over the civil action because it involved extraterritorial conduct that did not directly result from acts occurring within the United States and that did not have an effect on U.S. residents or U.S. markets.

The District Court granted the SEC's motion for summary judgment on November 13, 2001. As an initial matter, the Court determined that it had jurisdiction over the subject matter of the case. *Berger,* 244 F.Supp.3d at 188–89. The Court reasoned:

> Although the Fund operated as a qualified offshore investment fund, and substantial activities for the Fund—including marketing efforts, administration and auditing—were conducted outside of the United States, the fraud was run from the United States and the decisions made in the United States were directly responsible for investor losses. Specifically, the fraud was conceived and executed in New York by Berger, who implemented the scheme through his wholly-owned company, MCM, a Delaware corporation with its principal place of business in New York. The Offer Memo advertises the Fund to "U.S. entities subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or other entities exempt from U.S. tax," among others. Berger's investment strategy principally involved the concentrated short selling on American exchanges of securities of United

States technology companies. The Fund's securities transactions were cleared in New York by Bear Stearns and the Fund's assets were in Baer Stearns' custody in New York. Berger prepared the fictitious financial statements in New York. These statements were then sent offshore to the Fund's administrators, and then calculations based on these statements were retransmitted back into this country and abroad to prospective investors, current shareholders, and their agents.

*Id.* at 188–189 (footnote omitted). Based on the conduct described above, the District Court concluded that the complaint "address[es] a fraud conceived and executed in New York," and therefore that it had subject matter jurisdiction to entertain the complaint. *Id.* at 189.

After determining that it had jurisdiction, the Court granted the SEC's motion for summary judgment, holding that "[e]ither through Berger's plea allocution or through other documentary and testimonial evidence, the SEC has offered sufficient evidence of Berger's liability." *Id.* at 191. This timely appeal followed.

Immediately after Berger filed the instant appeal, but prior to his sentencing in the criminal matter, Berger fled the United States. He is still a fugitive from justice. *See* Paul Tharp, "Fugitive Fund Crook Sighted in Caribbean," *New York Post*, Feb. 1, 2003, at 19.

### DISCUSSION

■ On appeal, Berger does not challenge the District Court's ultimate determination that the record established his liability. Instead, he challenges only the District Court's conclusion that it had jurisdiction over the subject matter of the instant action. We review a district court's ruling on subject matter jurisdiction *de novo. See, e.g., Moser v. Pollin,* 294 F.3d 335, 339 (2d Cir.2002).

### A. *Fugitive Disentitlement Doctrine*

The SEC argues that we need not address the issue of subject matter jurisdiction. Instead, it asks us to dismiss this appeal pursuant to the "fugitive disentitlement" doctrine.

■ It is well-settled that federal courts "have authority to dismiss an appeal or writ of certiorari if the party seeking relief is a fugitive while the matter is pending." *Degen v. United States,* 517 U.S. 820, 824, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996). We have applied this equitable doctrine to dismiss fugitives' appeals in civil as well as criminal cases, as long as there is some nexus between the fugitive status and the course of appellate proceedings. *See Empire Blue Cross & Blue Shield v. Finkelstein,* 111 F.3d 278, 280–81 (2d Cir.1997) (citing *Ortega–Rodriguez v. United States,* 507 U.S. 234, 242–48, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993)). A sufficient nexus exists when the defendant is a fugitive during his ongoing appeal and his absence frustrates a civil judgment against him. *See Ortega–Rodriguez,* 507 U.S. at 249, 113 S.Ct. 1199; *United States v. Morgan,* 254 F.3d 424, 427 (2d Cir.2001); *Finkelstein,* 111 F.3d at 282.

In the past, we advanced four independent grounds for disentitling fugitives: (1) assuring the enforceability of any decision that may be rendered against the fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice and promoting the efficient operation of the courts; and (4) avoiding prejudice to the other side caused by the defendant's escape. *See, e.g., Bar–Levy v. United States Dep't of Justice, INS,* 990 F.2d 33, 35 (2d Cir.1993) (quoting *United States v. Persico,* 853 F.2d 134, 137 (2d Cir.1988)). In *Degen v. United States,*

however, the Supreme Court called into question the validity of the second and third of these justifications, holding that, with respect to "[t]he need to redress the indignity visited upon the District Court by [the defendant's] absence from the criminal proceeding, and the need to deter flight from criminal prosecution by [the defendant] and others," disentitlement "would be an arbitrary response to the conduct it is supposed to redress or discourage." 517 U.S. at 828, 116 S.Ct. 1777. The Court explained further that "[t]here would be a measure of rough justice in saying [that the defendant] must take the bitter with the sweet, and participate in the [legal process] either for all purposes or none. But the justice would be too rough." *Id.* at 829, 116 S.Ct. 1777.

Although *Degen* does not expressly preclude consideration of these two factors in determining whether a fugitive should be disentitled, in light of the Supreme Court's discussion in *Degen,* the most persuasive justifications for disentitlement are now (1) the inability to enforce a decision rendered by the appellate court, and (2) the need to avoid prejudice to the other party resulting from the defendant's fugitive status. With respect to the latter factor, there can be no doubt that Berger's absence has not prejudiced the SEC. Berger has already admitted to all the facts necessary to prove the SEC's case, and he does not contest these facts on appeal. The SEC urges us, however, to dismiss the appeal because any decision we may render would not be enforceable while Berger is at large. In particular, the SEC notes that Berger does not have sufficient assets in the United States that could be attached in order to cover the monetary sanctions against him, and that the SEC cannot bring a contempt proceeding against Berger for his failure to pay without first locating him.

Berger suggests that he owns two houses in the United States that might allow the SEC to enforce part of its judgment against him despite his fugitive status. We cannot resolve the disentitlement issue on this basis because Berger asserts it for the first time on appeal without any factual support in the record. Were these facts necessary to our disposition of the appeal, we would remand for factual findings or instruct the parties to submit affidavits directly to this Court. *Cf. Finkelstein,* 111 F.3d at 279. Such action is unnecessary, however, because Berger's appeal is without merit. Accordingly, in the interests of judicial economy, we exercise our discretion to reach the jurisdictional question, and we affirm the judgment of the District Court.

## B. *Subject Matter Jurisdiction*

Although Title 15 of the United States Code, which sets forth the various statutes governing securities exchanges, is silent as to the extraterritorial application of these statutes, we have recognized that subject matter jurisdiction may extend to claims involving transnational securities frauds. *See, e.g., Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991) (citing 15 U.S.C. § 78aa). To provide guidance on this topic, we have stated that, where "a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than [to] leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.1975). In applying this standard, we have consistently looked at two factors: (1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens. *See, e.g., Europe &*

*Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 125 (2d Cir.1998); *Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 121–22 (2d Cir.1995); *Psimenos v. E.F. Hutton & Co., Inc.,* 722 F.2d 1041, 1045 (2d Cir.1983). In evaluating these two factors, we apply what are known respectively as the "conduct test" and the "effects test."

In considering the conduct test, we have held that jurisdiction exists only when "substantial acts in furtherance of the fraud were committed within the United States," *Psimenos,* 722 F.2d at 1045 (citing *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1018 (2d Cir.1975)), and that the test is met whenever (1) "the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere" and (2) the "activities or culpable failures to act within the United States 'directly caused' the claimed losses." *Itoba,* 54 F.3d at 122 (citations omitted).

■ Berger argues that we lack subject matter jurisdiction pursuant to the conduct test because his actions in New York did not "directly" cause the perpetration of the fraud. More specifically, he maintains that the inaccurate monthly account statements, prepared and mailed to investors by the Fund administrator in Bermuda, constitute the heart of the fraud, and that his own activities in New York were therefore "merely preparatory," rather than a "direct" cause of harm to the investors. Def.'s Br. at 28–29.

In response, the SEC first contends that, where securities fraud litigation is brought by the SEC rather than by private plaintiffs, there need not be a direct causal connection between the actions in

the United States and the claimed losses resulting from the fraud in order for jurisdiction to exist. The SEC notes that, unlike private plaintiffs, it may bring securities fraud actions prophylactically in order to prevent loss to the public before it occurs and to protect the integrity of the stock exchanges: "Unlike private antifraud plaintiffs, who must demonstrate reliance and loss as an element of their actions, *see, e.g., Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), 'the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money[,]' *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985)." Pl.'s Br. at 36. The SEC reasons that, because the statutory cause of action itself contains no actual loss requirement for cases brought by the SEC, it cannot be required for jurisdictional purposes to show that conduct in the United States directly caused loss to investors. *Id.*

We have in fact held that "[t]he [Securities and Exchange] Commission's duty is to enforce the remedial and preventive terms of the [securities laws] in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury." *Berko v. SEC,* 316 F.2d 137, 143 (2d Cir.1963). But we do not think that the SEC's ability to bring a securities fraud action before the fraudulent conduct has caused any harm overrides the generally applicable principles of subject matter jurisdiction.[2]

In any event, the SEC was not merely acting prophylactically here: It claims that Berger's actions in New York actually

2. We recognize that, in cases where the SEC brings suit prophylactically, it will be necessary to modify the conduct test to account for the fact that no harm or loss has occurred. We might, for example, simply require a *rea-sonable foreseeability* that the conduct in the United States would directly cause a loss or harm to investors. Because the SEC was not acting prophylactically in this case, however, we need not address this issue here.

caused hundreds of millions of dollars of losses to investors. We must therefore apply the traditional conduct test and determine whether Berger's conduct in the United States directly caused these losses.

Applying this test, we hold that subject matter jurisdiction clearly exists over Berger's actions. As an initial matter, Berger's conduct was more than "merely preparatory": Berger admits that

> the following activities which materially related to the fraud took place in the United States: (1) creation of false financial information; (2) transmission of that false financial information overseas; [and] (3) approval of the resulting false financial statements prior [to] the statements being sent to investors.

Def.'s Br. at 11. In the words of Judge Cote,

> Berger prepared the fictitious financial statements in New York. These statements were then sent offshore to the Fund's administrators, and then calculations based on these statements were retransmitted back into this country and abroad to prospective investors, current shareholders, and their agents.

*Berger*, 2001 WL 34070098 at *4. Clearly, the fraudulent scheme was masterminded and implemented by Berger in the United States. *Cf. SEC v. United Financial Group, Inc.*, 474 F.2d 354, 355–56 (9th Cir.1973) (finding jurisdiction over fraud committed by offshore mutual funds that invested in U.S. companies in part because "the complex of foreign companies was in fact directed and controlled as an integrated whole from the United States");[3] *see*

*also Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 130 & n. 16 (2d Cir.1998) (observing that this Court has "found jurisdiction over a predominantly foreign securities transaction under the conduct test when, in addition to communications with or meetings in the United States, there has also been a transaction in a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress") (collecting cases).

Even if his actions in the United States were more than "merely preparatory," Berger maintains that these actions are insufficient to confer jurisdiction on United States courts because the activity *directly* causing harm to investors occurred in Bermuda. To support his argument, Berger relies on our opinions in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.1975), and *Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118 (2d Cir.1995).

First, Berger analogizes the circumstances in this case to the facts in *Bersch*, where plaintiffs brought a class action on behalf of a largely foreign class alleging that the defendants fraudulently failed to reveal material facts in prospectuses accompanying certain stock offerings listed outside of the United States. We concluded that "[t]he fraud ... was committed by placing the allegedly false and misleading prospectus in the purchasers' hands" and that "the final prospectus emanated from a foreign source." *Bersch*, 519 F.2d at 987. Accordingly, we held that "the action and inaction which ... occurred in the United States would not of itself confer subject

---

3. *United Financial* presented a slightly different case because a small number of American investors were harmed by the fraud, but as this Court stated in *Vencap*, "we doubt that the result in [*United Financial*] ... would have differed if the court had not been able to find that the issuer was an American corpora-

tion and that three American investors held $10,000 of its probably worthless stock." 519 F.2d at 1017; *see also Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 987 n. 29 (2d Cir. 1975) (describing *United Financial* as involving "a scheme masterminded by a United States issuer and based in the United States").

matter jurisdiction with respect to foreign plaintiffs." *Id.*

While it is true that in this case, as in *Bersch*, the fraudulent document actually provided to the Fund's investors "emanated from a foreign source," *id., Bersch* does not control the outcome here. First, the holding in *Bersch* was limited to jurisdiction over class action lawsuits on behalf of unnamed foreigners: We expressly noted in *Bersch* that "Congress did not mean the United States to be used as a base for fraudulent securities schemes even when the victims are foreigners, *at least in the context of suits by the SEC* or by named foreign plaintiffs." *Id.* (citing *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir.1975)) (emphasis added). Further, our holding in *Bersch* was based on the fact that "the United States activities [were] merely preparatory ... and [were] relatively small in comparison to those abroad." *Id.* In this case, however, the fraudulent conduct was carried out entirely by Berger in New York, and he essentially admitted as much in his plea allocution. Although the statements that ultimately conveyed the fraudulent information to investors were prepared and mailed in Bermuda, the preparation and mailing of these inaccurate statements was not itself fraudulent: The Fund Administrator was simply acting under Berger's instruction in preparing the monthly account statements, which provided a means for Berger to distribute false information that he had already fraudulently concocted in the United States.

Berger also relies on our holding in *Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118 (2d Cir.1995), to support his contention that subject matter jurisdiction is lacking. In *Itoba*, the defendants argued on appeal that no jurisdiction existed in the federal courts because the allegedly fraudulent financial statements were actually prepared

in England and were only transmitted to the United States so that they could be filed with the SEC. We held that jurisdiction existed in *Itoba*, explaining: "[T]he situs of preparations for SEC filings should not be determinative of jurisdictional questions. Otherwise, the protection afforded by the Securities Exchange Act could be circumvented simply by preparing SEC filings outside the United States. We find no support in the Act for such a result." *Id.* at 124.

We are perplexed as to why Berger believes this passage from *Itoba* supports his argument. To the contrary, *Itoba* makes clear that we do not lack subject matter jurisdiction in this case simply because the financial statements that were disseminated to the Fund's investors were prepared in Bermuda. As we explained in *Itoba*, 54 F.3d at 124, were we to hold otherwise, the protection afforded by the securities laws could be circumvented simply by preparing such statements outside of the United States.

In sum, while operating entirely from New York, Berger executed a massive fraud upon hundreds of investors involving transactions on United States exchanges. Accordingly, the District Court properly determined that it had subject matter jurisdiction under the conduct test. We have no doubt that the effects of Berger's actions were felt substantially in the United States, but because jurisdiction clearly exists pursuant to the conduct test, we need not consider whether jurisdiction over the instant action might also be grounded on the effects test. *See Psimenos*, 722 F.2d at 1045 (holding that courts need not "reach the question whether the effects test provides an independent basis for jurisdiction" when there is jurisdiction under the conduct test).

CONCLUSION

We hold that the District Court had subject matter jurisdiction over the instant action. Because Berger does not contest the District Court's determination of liability, we affirm the judgment of the District Court without reaching the question of whether, in these circumstances, we should apply the fugitive disentitlement doctrine.