Stephanie TABOR, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

BODISEN BIOTECH, INC., Bo Chen, Wang Chunsheng, Karen Quiong Wang, Yiliang Lai, and Kabani & Co., Inc., Defendants.

No. 06 Civ. 13220(VM).

United States District Court, S.D. New York.

Sept. 18, 2008.

Kim Elaine Miller, Kahn Gauthier Swick, LLC, New York, NY, for Butterfield Trust Group, Fraser Laschinger.

Phillip C. Kim, The Rosen Law Firm P.A., New York, NY, for Stephanie Tabor, BBC Investor Group.

Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY, for Anthony Desantis.

Evan J. Smith, Brodsky & Smith, LLC, Mineola, NY, for Yuchen Zhou.

Jeffrey Michael Norton, Wechsler Harwood LLP, New York, NY, for Ronal F. Stubblefield.

Bradley Peter Dyer, Stull Stull & Brody, New York, NY, Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY, Garrett D. Blanchfield, Jr., Reinhardt, Wendorf & Blanchfield, St. Paul, MN, Michael D. Braun, Braun Law Group, P.C., Los Angeles, CA, for Adam Cohen.

Bradley Peter Dyer, Stull Stull & Brody, New York, NY, for Lawrence M. Cohen.

Lawrence Joseph Reina, Jr., Reed Smith (NYC), New York, NY, David S. Reidy, Michael J. Coffino, Reed Smith, LLP (San Francisco), San Francisco, CA, for Bodisen Biotech, Inc., Wang Qiong.

Judd Burstein, Judd Burstein, P.C., New York, NY, Michael Sangyun Kim, Steven William Perlstein, Kobre & Kim LLP, New York, NY, for New York Global Group, Inc., Benjamin Wey.

Alan M. Gelb, Jones Hirsch Connors and Bull, P.C., New York, NY, for Kabani & Co., Inc.

Lawrence Joseph Reina, Jr., Reed Smith (NYC), New York, NY, for Lai Yiliang, Wang Chunsheng, Karen Qiong Wang.

William Bernard Federman, Federman & Sherwood, Oklahoma City, OK, for WR Capital Management.

Catherine A. Torell, Cohen Milstein, Hausfeld & Toll, PLLC, New York, NY, for Bodisen Investor Group.

Thomas James Kennedy, Murray, Frank & Sailer, LLP, New York, NY, for Chicago Inv. Group.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiffs brought this action on behalf of a potential class of purchasers of common stock of Bodisen Biotech, Inc. ("Bodisen") between November 3, 2005 and November 10, 2006 (the "Class Period") against defendants Bodisen, Bo Chen ("Chen"), Wang Chunsheng ("Chunsheng"), Karen Quiong Wang ("Wang"), Yiliang Lai ("Lai"), and Kabani & Co., Inc. ("Kabani") (collectively, "Defendants"). Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act") and the Securities and Exchange Commission ("SEC") Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

Bodisen, Chen, Chunsheng, Quiong, and Lai (collectively, "Bodisen Defendants") move under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") to dismiss the Consolidated Amended Class Action Complaint, dated November 16, 2007 (the "Complaint") for lack of subject matter jurisdiction over the claims of certain potential class members.[1] For the reasons discussed below, Bodisen Defendants' motion to dismiss for lack of subject matter jurisdiction is GRANTED.

## I. BACKGROUND[2]

### A. THE PARTIES

#### 1. Plaintiffs

By Order dated August 13, 2007, the Court appointed the Butterfield Trust Group, which includes Anthony S. Butterfield ("Butterfield")[3] and Anteo Quinta-

---

1. Defendants also move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and 9(b) ("Rule 9(b)") and the Private Security Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, asserting that the Complaint fails to state a claim upon which relief may be granted and to plead fraud with sufficient particularity. The Court issued a decision on that motion in a separate ruling. (*See* Decision and Order, dated September 18, 2008 (the "Rule 12(b)(6) Order")).

2. The factual summary below is derived from the Complaint; Defendants' Memorandum of Law in Support of Motion to Dismiss Claims of Foreign Investors Pursuant to Rule 12(b)(1), dated May 2, 2008 (Defs.' Mem.); Lead Plaintiffs' Memorandum in Opposition to Defendants' Memorandum, dated June 11, 2008 ("Pls.' Mem."); and Defendants' Reply Memorandum of Law in Further Support of Defendants' Memorandum, dated July 11, 2008. Except as quoted or otherwise cited, no other specific reference to these documents will be made.

3. Butterfield is an American citizen who purchased 89,365 Bodisen Shares on the American Stock Exchange ("AMEX").

valle ("Quintavalle"),[4] as lead plaintiffs ("Lead Plaintiffs"). Lead Plaintiffs assert that they bring this action on behalf of a potential class of purchasers of common stock of Bodisen ("Bodisen Shares") during the Class Period.

### 2. Bodisen Defendants

On January 14, 2000, Bodisen incorporated in Delaware, with its principal place of business in Xi'an, China. Bodisen purportedly engages in the development, manufacture, and sale of pesticides and compound organic fertilizers in China. Chen, Chunsheng, Wang, and Lai were all officers of Bodisen during the Class Period.

### B. BODISEN SHARES

Bodisen's Shares were initially registered and traded on the National Association of Securities Dealers ("NASD") Over-the-Counter Bulletin Board. Beginning in 2005, Bodisen "endeavor[ed] to seek dual listing" of its shares on AMEX and AIM in order "to raise growth capital, expand [its] institutional shareholder base and potentially increase [its] product distribution to international markets." (Compl. ¶ 53 (citing February 6, 2006 Press Release ("February 2006 Press Release")).) On August 29, 2005, Bodisen transferred its shares from the NASD to the AMEX. Lead Plaintiffs assert that Bodisen Shares reached a Class Period trading high (above twenty dollars per share) in January 2006. In February 2006, Bodisen listed approximately five percent of its shares on AIM (the "AIM Offering"). In March 2006, Bodisen completed a private offering by which it sold over 5.32 million restricted Bodisen Shares to institutional investors.

On November 6, 2006, Bodisen received a letter from AMEX (the "Delisting Letter") stating that AMEX had determined that Bodisen was not in compliance with certain AMEX listing standards. On November 12, 2006, Bodisen issued a press release, stating that:

> Among other things, AMEX believes that [Bodisen] made insufficient or inaccurate disclosure in its public filings with regard to its relationship with, and payments to, a consultancy firm and its affiliates both prior to and subsequent to its listing on [AMEX]. Additionally, ... [AMEX] expressed concern that [Bodisen] has internal control issues related to its accounting and financial reporting obligations.

(Id. ¶ 29.) The following day, Bodisen Defendants filed with the SEC, pursuant to Form 8–K, a statement that Bodisen had received the Delisting Letter. Lead Plaintiffs assert that in November 2006 the trading price of Bodisen Shares "collapsed" to below six dollars per share. (Id. ¶ 17.)

In March 2007, according to Lead Plaintiffs, Bodisen Shares were delisted from AMEX because Bodisen

> engaged in a pattern and practice of non-compliance with AMEX listing requirements encompassing a broad range of qualitative and corporate governance concerns as well as violations of applicable federal and/or state securities laws ... [Bodisen] has evidenced that it is unable to (I) effectively monitor its compliance with federal and/or state securities laws, as well as AMEX requirements, and (ii) appropriately oversee the

---

4. Quintavalle is an Italian citizen who purchased 200,000 Bodisen Shares, including 188,350 on AMEX, and 11,650 on the AIM Market ("AIM"), formerly known as the Alternative Investment Market, of the London Stock Exchange ("LSE"). AIM is an alternative market principally for smaller capitalized companies. (See Declaration of Jeff V. Rodwell, dated Mar. 21, 2007 ("Rodwell Decl.") at ¶ 3.)

actions and activities of its consultants, agents and advisors.

(*Id.* ¶ 31 (*citing* Notice of Delisting from AMEX, dated March 22, 2007 (the "Delisting Notice")).) Lead Plaintiffs further assert that, "[f]ollowing delisting on [AMEX], while [Bodisen Shares] were frozen in the U.S., [Bodisen Shares] listed in London on [AIM] continued to trade lower, collapsing over 63% in [a] single trading day . . . ." (*Id.* ¶ 102.)

On April 1, 2007, it was reported that "Bodisen would move from [AMEX] to the Over the Counter Market ("OTC")" and, on the following day, "Bodisen opened trading on the OTC exchange." (*Id.* ¶ 106.) Bodisen subsequently published a press release, on March 27, 2007, informing investors that Bodisen had received the Delisting Notice. By July 24, 2007, Bodisen Shares "traded to a low of just above [one dollar] per share." (*Id.* ¶ 109.)

## C. *THE AIM OFFERING*

In 2005, Bodisen commenced efforts to obtain listing status on AIM. Bodisen Defendants assert that they took various steps to obtain listing on AIM, including: (1) due diligence in London; (2) retaining Charles Stanley Securities ("Charles Stanley"), a British firm located in London, as its Nominated Advisor ("Nomad");[5] (3) gauging interest in Bodisen Shares; (4) holding road shows (where Bodisen representatives met prospective investors) primarily in the United Kingdom and Hong Kong; (5) preparing, printing and distributing an admission document (the "Admission Document") (which is similar to a prospectus in the United States); and (6) placing Bodisen Shares with institutional

buyers. In addition, New York Global Group ("NYGG") acted as the United States Corporate Advisor in connection with the AIM Offering.

Bodisen Defendants also assert that Charles Stanley prepared the Admission Document in the United Kingdom, and that Deloitte & Touche U.K. ("Deloitte") served as the reporting accountant for the AIM Offering, preparing reports on Bodisen's financial condition. Financial statements audited and reviewed by Kabani,[6] an independent certified public accounting firm located in California, were attached to the Admission Document. Members of Bodisen's Board of Directors (the "Board"), located in China and the United States, provided final approval of the Admission Document.

Bodisen Defendants further assert that, prior to the filing of the Admission Document, Charles Stanley prepared a draft of the Admission Document (the "Draft Admission Document") to secure purchaser interest for the AIM Offering and identify the ultimate institutional investors. "To qualify for the share placement, prospective institutional buyers had to fall within one or more categories under the U.K. statute entitled the Financial Services and Markets Act 2000." (Rodwell Decl. ¶ 13.) In addition, "[t]hey had to represent, in writing, that no steps had been taken to enable any of the Placing Shares to be acquired by persons resident in the United States' and that they were not in or a national or resident of the United States." (*Id.*) (internal quotations omitted).

Bodisen Defendants also allege that, once institutional investors indicated inter-

---

5. A Nomad must be approved by the LSE and is typically an investment firm. The function of a Nomad is to "assess[ ] the appropriateness of an issuer for AIM" and "advise[ ] the issuer on its regulator responsibilities" with respect to an issuer's admission on AIM and

any ongoing obligations it may have with respect to AIM. (Rodwell Decl. at ¶ 4.)

6. Kabani served as Bodisen's auditor and principal accounting firm from February 26, 2004 through July 30, 2007.

est based on the Draft Admission Document, Charles Stanley negotiated stock pricing and thus "built the book for the [Aim Offering]." (*Id.* ¶ 14.) After Charles Stanley and Bodisen agreed on the price and the number of Bodisen Shares, Charles Stanley distributed Placement Letters ("Placement Letters") to institutional investors containing the final price and number of Bodisen Shares to be purchased. Once the signed Placement Letters were received, Charles Stanley finalized the Admission Document and filed it with AIM.

Bodisen also filed with the SEC a prospectus (the "Prospectus") and a registration statement (the "Registration Statement"), which contained a Report of Independent Registered Public Accounting Firm prepared by Kabani. Bodisen Defendants claim that the "sole purpose of the SEC filings was to eliminate the need for a restrictive trading legend on the Bodisen [S]hares made available in the AIM [O]ffering ... [t]his made it easier for AIM purchasers electronically to trade their shares through CREST (the London electronic trading and settlement system)." (Defs.' Mem. at 7.) In accordance with AMEX rules and Bodisen's listing agreement with AMEX, Bodisen also sought and obtained approval by AMEX for the placement of Bodisen Shares on AIM.

On February 6, 2006, Bodisen became an AIM-listed company and placed 1.643 million shares (approximately five percent) of Bodisen Shares with approximately 30 institutional investors in London.

## II. *DISCUSSION*

### A. *LEGAL STANDARD*

The inquiry on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) concerns whether the district court has the statutory or constitutional power to adjudicate the case. *See Maka-*

*rova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.; see also Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). The preliminary showing that must be made by the plaintiff, however, is not meant to be overly burdensome, "allowing for subject matter jurisdiction so long as 'the federal claim is colorable.'" *Cromer Fin. v. Berger,* 137 F.Supp.2d 452, 467 (S.D.N.Y.2001) (*quoting Savoie v. Merchants Bank,* 84 F.3d 52, 57 (2d Cir.1996)); *see also Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 121 n. 1 (2d Cir.1998) (*"Banque Paribas"*) ("[A] plaintiff ... should not be deprived of its day in an American court by a Rule 12(b)(1) order based on erroneous facts.... In a close case, the factual basis for a court's subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time." (citations and quotation marks omitted)).

Rule 12(b)(1) challenges to subject matter jurisdiction may contest either the facial sufficiency of the pleadings in the complaint or the existence of subject matter jurisdiction in fact. *See Dow Jones & Co., Inc. v. Harrods,* 237 F.Supp.2d 394, 404 (S.D.N.Y.2002). "In a facial challenge, the court accepts as true the uncontroverted factual allegations in the complaint." *Id.* In resolving a factual challenge to subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings. *See Makarova,* 201 F.3d at 113; *see also Kamen v. American Tel. &*

*Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986). The Court may "weigh the evidence on the record accompanying the Rule 12(b)(1) motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute." *Dow Jones*, 237 F.Supp.2d at 404.

■ To determine whether a district court may exercise subject matter jurisdiction over the claims of foreign plaintiffs regarding conduct related to foreign securities transactions, courts in the Second Circuit look at two factors: (1) whether the wrongful conduct occurred in the United States (the "Conduct Test"), or (2) whether the wrongful conduct, even if it occurred in a foreign country, had a substantial adverse effect in the United States or upon United States citizens (the "Effects Test"). *See Securities and Exchange Commission v. Berger*, 322 F.3d 187, 192 (2d Cir.2003) (citations omitted). A plaintiff need only satisfy either the Conduct or the Effects test to support a finding of subject matter jurisdiction. *See Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir.1983) (finding that courts need not "reach the question whether the effects test provides an independent basis for jurisdiction" when there is subject matter jurisdiction under the conduct test).

## B. *APPLICATION*

■ Bodisen Defendants argue that the Court lacks subject matter jurisdiction over the claims of two categories of foreign investors: (1) shareholders who purchased Bodisen Shares on the LSE (the "LSE Purchasers"), and (2) shareholders who are citizens of the People's Republic of China (the "PRC Shareholders"). Lead Plaintiffs contend that, at this stage of the litigation where no class has been certified, the Court should consider whether it has subject matter jurisdiction only over the claims of Lead Plaintiffs. Specifically, Lead Plaintiffs assert that Bodisen Defendants can move to strike class allegations under Federal Rule of Civil Procedure 23 when Lead Plaintiffs move to certify a class, and that the Court can raise subject matter jurisdiction at any stage of the proceeding. The Court agrees. *See Adams v. Suozzi*, 433 F.3d 220, 224 (2d Cir.2005) (stating that federal courts "may examine subject matter jurisdiction, sua sponte, at any stage of the proceeding.") (citation and quotation marks omitted). Since Lead Plaintiffs do not include any shareholders who are citizens of the PRC, the motion of Bodisen Defendants in this regard is speculative and premature. The Court will not consider whether it has subject matter jurisdiction over the claims of the PRC Shareholders.

However, because Lead Plaintiffs include Quintavalle, a foreign investor who purchased Bodisen Shares on AIM, the Court will consider whether it has subject matter jurisdiction over the claims of the LSE Purchasers.

### 1. *The Conduct Test*

■ To determine whether subject matter jurisdiction exists under the Conduct Test, a court "center[s] its inquiry ... on the nature of conduct within the United States as it relates to carrying out the alleged fraudulent scheme, on the theory that Congress did not want 'to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'" *Psimenos*, 722 F.2d at 1045 (*quoting IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir.1975)). The Second Circuit has explained that the antifraud provisions of the Exchange Act do not "apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses." *Bersch v. Drexel Firestone,*

*Inc.*, 519 F.2d 974, 993 (2d Cir.1975). In *Berger*, the Second Circuit further explained that

> [i]n considering the conduct test, we have held that jurisdiction exists only when "substantial acts in furtherance of the fraud were committed within the United States," *Psimenos*, 722 F.2d at 1045 (*citing Vencap*, 519 F.2d at 1018), and that the test is met whenever (1) "the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere" and (2) the "activities or culpable failures to act within the United States 'directly caused' the claimed losses."

322 F.3d at 193 (*quoting Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995)).

Although no precise test has emerged from the various decisions in this Circuit discussing the application of the Conduct Test, a number of factors have been considered in the ultimate determination as to whether subject matter jurisdiction exists, including: (1) the elements of the wrongful conduct in question as pled in plaintiff's theory of fraud in relation to the specific acts to which the statute apply; (2) the location of domestic conduct and contacts associated with the transaction in relation to those located in foreign states; (3) the timeline identifying when and where the relevant domestic and foreign acts occurred; (4) the materiality/substantiality of the domestic conduct relative to the particular fraudulent transaction the pleadings describe; (5) the causal connection between the domestic conduct and the alleged financial losses resulting from the alleged fraudulent transaction; and (6) an overarching measure of reasonableness gauged by the intent of congressional policy and principles of fairness in the circumstances surrounding the particular case. *See In re Alstom*, 406 F.Supp.2d 346, 376 (S.D.N.Y.2005); *see also Berger*, 322 F.3d

at 193–95; *Banque Paribas*, 147 F.3d at 129–30; *Psimenos*, 722 F.2d at 1044–46; *Bersch*, 519 F.2d at 985. None of these factors are meant to be weighed independent of the others, rather they must be considered in conjunction, and no particular factor is dispositive. *See IIT, an Intern. Inv. Trust v. Cornfeld*, 619 F.2d 909, 918 (2d Cir.1980) (stating that "[i]t should be evident by now that 'the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction ... is not necessarily dispositive' in future cases") (*quoting Continental Grain (Australia) v. Pacific Oilseeds, Inc.*, 592 F.2d 409, 414 (8th Cir.1979)).

### a. *Theory of Fraud*

 Under the fraud theory, the Court examines whether Lead Plaintiffs' asserted sufficient operative facts describing acts or transactions that, if proved, would constitute a violation of United States securities laws. *See Alstom*, 406 F.Supp.2d at 376–77 (stating that "[w]ith regard to whether the conduct in question falls within the scope of the activities to which the securities laws properly apply ... a threshold inquiry must examine the theory of the fraud plaintiffs claim, that is, precisely what constitutes the harmful acts the complainants allege comprise the fraudulent securities transaction so as to bring that conduct within the reach of the securities statutes") (*citing Vencap*, 519 F.2d at 1011–13, 1018; *Berger*, 322 F.3d at 194; *Bersch*, 519 F.2d at 987). Thus, the Court, in analyzing this factor, considers issues that are addressed in the Court's Rule 12(b)(6) Order. *See Vencap*, 519 F.2d at 1011. If neither Lead Plaintiffs' theory of liability nor the factual allegations of the pleadings presented in support of it portray activities within the scope of the wrongdoing the securities statutes proscribe, the jurisdictional inquiry would end

at this point. *See Alstom,* 406 F.Supp.2d at 385 (*citing Vencap,* 519 F.2d at 1018).

Accordingly, because the Court, by separate Order dated September 18, 2008, granted Defendants' motion to dismiss pursuant to Rule 12(b)(6) for failure to plead with particularity in accordance with Rule 9(b) and the heightened pleading standards prescribed by the PSLRA (*See* Rule 12(b)(6) Order), the Court must necessarily grant Defendants' motion to dismiss pursuant to Rule 12(b)(1). However, the Court the notes that Plaintiffs were granted leave to replead. Thus, the Court will analyze the remaining factors of the Conduct Test in an effort to provide guidance and thus avoid unnecessary motion practice should Lead Plaintiffs file an amended complaint that satisfies the heightened pleading standards applicable to this action.

If the Court had not dismissed Lead Plaintiffs' securities fraud claims pursuant to Rules 12(b)(6) and 9(b), it would next examine the nature of the wrongful conduct alleged by Lead Plaintiffs and any connections among those acts. This inquiry would determine whether the Complaint alleges a continuing course of misconduct or whether any alleged misconduct that occurred in connection with the AIM Offering should be analyzed as an entirely separate transaction that involves only foreign actors engaged in a foreign transaction, as Bodisen Defendants contend.[7]

The Court is persuaded that the facts asserted so far are more consistent with a continuing course of alleged misconduct by Bodisen Defendants occurring throughout the Class Period. Lead Plaintiffs' allegations suggest a series of material misrepresentations or omissions throughout the Class Period. This is not a case in which the parties identify separate time periods, schemes, or motives underlying the alleged wrongful conduct. *See, e.g., Alstom,* 406 F.Supp.2d at 388–91. Rather, the AIM Offering occurred during the Class Period, and the allegations of Bodisen Defendants' fraudulent conduct and motivation in relation to that offering are the same as those asserted by Lead Plaintiffs in regard to Bodisen trading its shares on AMEX.

In addition, Bodisen Defendants' characterization of the AIM Offering in various press releases further suggest that the trading of Bodisen Shares on AMEX and AIM were related, and the trading on both exchanges may have furthered a continuous course of alleged misconduct by Bodisen Defendants. Specifically, Bodisen Defendants issued statements in various press releases announcing that Bodisen dually listed its shares on AMEX and AIM. (*See, e.g.,* February 2006 Press Release (stating "Global investors are able to buy the same Bodisen common stock listed both on the American Stock Exchange and in London").) In addition, Bodisen Defendants made various statements in the Admission Document indicating that Bodisen Shares were available on AMEX. (*See, e.g.,* Admission Document at 7 (stating that Bodisen "file[s] periodic reports with the SEC and [Bodisen Shares] trade on [AMEX] in the United States").)

Therefore, should Plaintiffs file an amended complaint that satisfies the relevant pleading standards, the claims thus far suggest that Bodisen Defendants allegedly engaged in a continuous course of conduct during the Class Period, which

---

7. Bodisen Defendants also contend that the Complaint lacks any allegations that fraud occurred in connection with the AIM Offering. However, Lead Plaintiffs allege that the Admission Document, the SEC filings (including the Registration Statement and the Prospectus), and various global press releases Bodisen issued, announcing that Bodisen was dually listed on AMEX and AIM, contain material misrepresentations or omissions, or misleading information.

would constitute a single theory of fraud, and would weigh in favor of the Court exercising subject matter jurisdiction over the claims of the LSE Purchasers.

### b. *Location of Relevant Conduct*

 Under the location factor, a court examines the relevant conduct in order to determine whether any part of the alleged wrongful transaction took place in the United States and which parts occurred abroad. A court looks at the "essential core" or center of gravity of the wrongdoing, and thus where the predominant activities of the alleged fraudulent transaction have taken place. *See Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*, 606 F.2d 5, 8 (2d Cir. 1979); *Alstom*, 406 F.Supp.2d at 377. This determination is made by enumerating and situating, according to place of occurrence, the pertinent material acts that, combined, constitute the alleged fraudulent scheme. Although the Court granted Defendants' motion to dismiss because Lead Plaintiffs failed to plead fraud with sufficient particularity, for the purposes of analyzing this prerequisite and the other relevant subject matter jurisdiction factors, the Court assumes that the operative facts in any amended complaint would be substantially similar to the facts alleged in the Complaint.

Bodisen Defendants contend that the relevant conduct alleged by Lead Plaintiffs did not occur within the United States. Specifically, they assert that the AIM Offering involved foreign investors purchasing Bodisen Shares on a foreign exchange, and that the preparation and printing of the offering materials in connection with the AIM Offering occurred primarily in London. Bodisen Defendants' assertion, however, ignores relevant conduct alleged to have occurred within the United States with respect to the AIM Offering, including the sale of an American corporation's stock, the approval of the Admission Document by two American members of the Board, the inclusion of an American accounting firm's audited financial reports in the Admission Document, and SEC filings. In addition, the Admission Document made various statements concerning Bodisen's domestic connections, including that: (1) the Admission Document "also constitutes a prospectus for the purposes of the SEC which is part of a registration statement that has been filed with the SEC;" (2) Bodisen is "[i]ncorporated in the State of Delaware;" (3) "Bodisen's stock transfer agent is based in Salt Lake City, Utah;" (4) Kabani, a certified public accounting firm located in California, "is denominated as an 'Expert' by [Bodisen]," has "audited the financial statements of [Bodisen] for the years ended December 31, 2002, 2003 and 2004[,] and [has] given unqualified audit reports on the accounts of the group for those periods;" (5) "[Bodisen] file[s] periodic reports with the SEC and [Bodisen Shares] trade[ ] on [AMEX] in the United States;" (6) two American Directors received stock and stock options for their service on the Board; (7) "Bodisen files periodic reports with the SEC," and "[a]fter admission on AIM, it will also have an obligation to notify both the SEC and the [LSE] of relevant information;" (8) the listing price was partly determined by the trading history of the Bodisen Shares on AMEX; (9) Bodisen invokes the protections afforded by Delaware law; (10) "[t]he principal legislation under which [Bodisen] operates is the law of the State of Delaware;" and (11) any dividends paid will be subject to a fifteen percent withholding tax under United States tax laws. (Admission Document at 1, 3, 7, 19–20, 66, 69–70, 72–80.)

Additionally, because, as discussed above, the facts pled thus far suggest that the alleged fraud constituted a continuous course of conduct by Bodisen Defendants,

the relevant conduct would not be limited to the conduct that occurred in connection with the AIM Offering, but would include all the allegations asserted in the Complaint. The Complaint identifies domestic actors and alleges numerous instances of domestic fraudulent conduct, including public filings and press releases. In addition, Bodisen is a Delaware corporation that traded its shares primarily on an American exchange. These facts suggest that the center of gravity of the alleged fraudulent conduct is located within the United States. Therefore, this factor likely would weigh in favor of the Court exercising subject matter jurisdiction over the claims of the LSE Purchasers.

### c. Timeline of Relevant Acts

■ Under the timeline factor, a court considers the time within which the alleged fraudulent conduct in the United States took place and when the alleged foreign fraudulent conduct occurred. *See Alstom,* 406 F.Supp.2d at 378. Lead Plaintiffs assert that the alleged fraud occurred throughout the Class Period predominately in the United States. Specifically, they allege that in preparation and in furtherance of the alleged fraud, Bodisen incorporated in the United States, traded its shares on the AMEX and conducted various domestic acts in furtherance of such trades, including filing various reports with the SEC. The AIM Offering occurred approximately six months after Bodisen Shares began trading on the AMEX, and any alleged misconduct that may have occurred in relation to that offering occurred during the Class Period. Thus, the time period of the alleged domestic fraudulent conduct and the alleged foreign fraudulent conduct overlap. Therefore, this factor likely would weigh in favor of the Court exercising subject matter jurisdiction over the claims of the LSE Purchasers.

### d. Materiality/Substantiality

■ Under this factor, a court considers the materiality/substantiality of the domestic conduct relative to the particular fraudulent transaction the pleadings describe. *See id.* at 379. Lead Plaintiffs claim that the alleged fraud began in the United States and that the AIM Offering would not have occurred but for Bodisen incorporating in the United States, trading its shares on the AMEX, and filing with the SEC. The allegations of this continuous course of conduct, which Lead Plaintiffs assert was initiated and performed predominately in the United States, suggest that the domestic conduct that gave rise to the alleged violation of the securities laws is material. Therefore, this factor likely would also weigh in favor of the Court exercising subject matter jurisdiction over the claims of the LSE Purchasers.

### e. Causation

■ Under the causation factor, a court considers whether the material conduct alleged to have occurred in the United States was in fact the conduct that caused the foreign plaintiffs' alleged losses. *See Bersch,* 519 F.2d at 993; *Alstom,* 406 F.Supp.2d at 381. Here, Lead Plaintiffs assert that Bodisen endeavored to dually list its shares on the AMEX and AIM as part of an overall scheme to mislead and defraud investors. Bodisen traded its shares primarily on the AMEX and offered only approximately five percent of its shares on the AIM. Lead Plaintiffs contend that the trading of Bodisen Shares on the Amex, and any other activities undertaken by Bodisen for that purpose, was essential to the AIM Offering. These allegations suggest that there is a causal connection between the AIM Offering, the domestic conduct, and any losses that the LSE Purchasers may have suffered, assuming that Lead Plaintiffs sufficiently

plead the domestic fraudulent conduct at the heart of this case. Therefore, this factor likely would weigh in favor of the Court exercising subject matter jurisdiction over the claims of the LSE Purchasers.

### f. *Reasonableness and Congressional Policy*

 Under this factor, a court considers whether extending jurisdiction in this case would be reasonable and in accordance with Congressional policy. *See Alstom*, 406 F.Supp.2d at 382–83. In analyzing this factor, a court assesses what vital United States interest would be served by providing a forum here and giving effect to American laws to adjudicate foreign claims.

The facts Lead Plaintiffs allege thus far suggest that it would be reasonable for the Court to exercise jurisdiction over the claims of the LSE Purchasers. This case concerns alleged violations of United States securities laws by an American corporation that traded its shares primarily on an American exchange, and that traded approximately five percent of its shares on a foreign exchange to foreign investors. *See Cornfeld*, 619 F.2d at 920 (stating that "Congress would have been considerably more interested in assuring against the fraudulent issuance of securities constituting obligations of American rather than purely foreign business"). Lead Plaintiffs contend that the alleged fraud began in the United States and that the AIM Offering was part of an overall scheme by Bodisen Defendants to deceive the investing public and cause Lead Plaintiffs to purchase Bodisen Shares at artificially inflated prices. The conduct related to the allegedly fraudulent securities transactions occurred predominantly within the United States. Therefore, this factor likely would weigh in favor of the Court exercising subject matter jurisdiction over the claims of the LSE Purchasers.

### III. *ORDER*

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion of defendants Bodisen Biotech, Inc., Bodisen, Bo Chen, Wang Chunsheng, Karen Quiong Wang, and Yiliang Lai ("Defendants") (Docket No. 73) to dismiss the Consolidated Amended Class Action Complaint herein for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is GRANTED, without prejudice to plaintiffs, the Butterfield Trust Group ("Lead Plaintiffs"), in the event Lead Plaintiffs sufficiently address the matters raised in this decision in an amended complaint filed in accordance with the Court's Decision and Order dated September 18, 2008, ruling on Defendants' motion to dismiss on other grounds.

**SO ORDERED.**