TERRA SECURITIES ASA
KONKURSBO, et al.,
Plaintiffs,

v.

CITIGROUP, INC., et al., Defendants.

No. 09 Civ. 7058(VM).

United States District Court,
S.D. New York.

Feb. 17, 2010.

Marc E. Kasowitz, John Charles Canoni, Michael Matthew Fay, Charles Matthew Miller, Kasowitz, Benson, Torres & Friedman LLP, New York, NY, for Plaintiffs.

Brad Scott Karp, John Frederick Baughman, Susanna Michele Buergel, Alastair Wood, Daniel H. Levi, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiffs Terra Securities ASA Konkursbo ("Terra") and seven Norwegian municipalities—Bremanger, Hattfjelldal, Hemnes, Kvinesdal, Narvik, Rana and Vik (the "Municipalities") (collectively, "Plaintiffs") filed a complaint in this action, dated August 10, 2009 (the "Complaint"), naming as defendants Citigroup, Inc. ("Citigroup"), Citigroup Global Markets, Inc. ("CGM New York") and Citigroup Alternative Investments LLC ("CAI")—(collectively, "Defendants"). Plaintiffs assert securities fraud claims under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as well as common law fraud and negligent misrepresentation claims. Defendants now move to dismiss Plaintiffs' claims, asserting that the Court lacks subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") or, alternatively, that New York is not a convenient forum for the litigation of this matter.[1]

For the reasons stated below, Defendants' motion to dismiss is DENIED.

## I. BACKGROUND [2]

In May and June of 2007, Defendants sold over $115 million in securities to the Municipalities through Terra, a Norwegian securities firm. The securities constituted notes linked to the Citi Tender Option Bond Fund (the "Fund"), a Cayman Island fund managed by CAI, a unit of CGM New York. Plaintiffs assert that the fund-linked notes ("FLNs") were structured and arranged by CGM New York and managed by CAI, and the FLNs were issued by two different European entities, Starling Finance P.L.C. and Banque AIG, for trading on the Irish Stock Exchange.

Beginning in or about April 2007, Defendants marketed the FLNs to the Municipalities. Plaintiffs allege that Defendants, through its affiliate Citigroup Capital Mar-

1. The Court received a letter from Defendants, dated October 7, 2009 ("Defs.' Oct. 7 Letter"), asserting jurisdictional and forum non conveniens deficiencies in Plaintiffs' claims. The Court deemed the Defs.' Oct. 7 Letter as Defendants' motion to dismiss for lack of subject matter jurisdiction and for forum non conveniens.

2. This factual background is derived from the Complaint and documents attached thereto, referenced therein or integral to its drafting, as well a chart entitled "Origin of Various Documents," to which the parties stipulated for the purposes of this motion to dismiss. In deciding a motion to dismiss under Rule 12(b)(1), the Court may consider these docu-

ments. *See Wetzel v. Town of Orangetown,* No. 06 Civ. 5144, 2007 WL 3009999, at *4 (S.D.N.Y. Oct. 12, 2007); *Faggionato v. Lerner,* 500 F.Supp.2d 237, 243 (S.D.N.Y.2007); *Miller v. Lazard, Ltd.,* 473 F.Supp.2d 571, 575 (S.D.N.Y.2007) (*citing Chambers v. Time Warner,* 282 F.3d 147, 152–53 (2d Cir.2002)). "A court confronted with a jurisdictional controversy may consider evidence outside the pleadings." *City of Edinburgh Council v. Vodafone Group Pub. Co.,* No. 07 Civ. 9921, 2008 WL 5062669, at *4 (S.D.N.Y. Nov. 24, 2008) (*citing Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998)). Unless specifically referenced, no further citation to these sources will be made.

kets, Ltd. ("CGM London"), materially misrepresented that the FLNs were safe, conservative investments. Plaintiffs point primarily to a presentation entitled "Citigroup Municipal Investors: TOB Capital Municipal Portfolio" ("Presentation I"), prepared by CGM New York in New York, and distributed to Terra for presentation to the Municipalities by CGM London or another Europe-based Citigroup entity.[3] Presentation I contains the CAI logo on every page, represents that two New York-based Citigroup employees, Craig Henick ("Henick") and Edward Sun, are the "Senior Portfolio Managers" of the Fund, and states that the Fund would be managed by a "highly experienced team spinning out of Citigroup's proprietary municipal bond trading desk to establish a fund within CAI." (Complaint ¶ 31; Declaration of Jon E. Skjorshammer ("Skjorshammer"), dated October 14, 2009 ("Skjorshammer Decl."), Ex. D.) Plaintiffs assert that Defendants insisted that Terra provide Presentation I to the Municipalities and that Terra did so at their insistence.

Presentation I marketed the Fund to municipal investors by describing the Fund's investment strategy, detailing its structure, and purporting to demonstrate the historical performance of municipal yields hedged with interest rate swap agreements. Presentation I described the Fund's investment strategy as an arbitrage opportunity for investors, whereby the Fund takes advantage of the relative steepness of the long-term municipal yield curve—the spread between long-term and short-term rates on municipal bonds. Specifically, Presentation I represented that the net amount long-term municipal bonds pay over the cost of lending short term (the "Arbitrage") was consistent over time. The Arbitrage would accumulate in the Fund and be distributed to investors.

Plaintiffs assert that the Fund, no matter the value of the Arbitrage, posed a risk for any investor and thus Defendants also used Presentation I to explain the Fund's hedging strategy. Presentation I explained how the Fund hedged against a drop in municipal bond values with interest rate swap agreements. Defendants represented that if the long-term municipal bonds dropped in value, the swap agreements would increase in value by an equal amount, thereby keeping the market value of the Fund stable. To market this hedging strategy, Presentation I contained graphs demonstrating the historically strong relationship between municipal bond rates and the London Interbank Offered Rate ("LIBOR"), the benchmark rate used for the interest rate swap agreements. Presentation I represented that the municipal bond and LIBOR rates had a near perfect correlation and that this correlation held even during periods of economic downturn, when short-term instruments typically pay more than long-term instruments.

Plaintiffs allege that Defendants' representations in Presentation I regarding the historically high correlation between municipal and LIBOR rates were material misstatements upon which they relied in deciding to invest in the FLNs. Plaintiffs contend that Defendants intentionally or recklessly focused on the relationship between levels of municipal and LIBOR interest rates instead of on the rates of change in those interest rates, and also ignored fundamental rules of statistical

---

**3.** The parties dispute whether CGM London or a Netherlands affiliate of Citigroup ultimately distributed Presentation I to Terra. (*Compare* Defs.' Oct. 7 Letter at 2, *and* Declaration of Peter Arnold in Support of Defendants' Motion to Dismiss, dated October 21, 2009 ("Arnold Decl."), ¶ 10, *with* Plaintiffs' Reply Letter, dated October 28, 2009, at 2.)

analysis. Defendants thereby misrepresented the statistical relationship between the rates and the riskiness of investment in the FLNs.

Within a few months after the Municipalities invested in the FLNs, the FLNs lost significant value. In August 2007, when the value of the FLNs was collapsing, Terra requested a meeting with Henick. In September and October 2007, Terra representatives met with Henick, among others, in New York.

Further, in late 2007 or 2008, CGM New York prepared a presentation addressing information requested by Terra entitled "Citigroup Municipal Investors, Customer–Requested Information for Terra" ("Presentation II"). Plaintiffs assert that Presentation II revealed that, prior to Plaintiffs' investment in the FLNs, Defendants had fraudulently withheld information showing the Fund's pro forma mark-to-market valuation from 2000 to 2007. Presentation II contained a graph showing the Fund's putative mark-to-market valuation before the Fund's inception in May 2006. The graph showed that the Fund would have suffered significant asset-value volatility over that time period, and Plaintiffs allege that this variation should not have occurred if the municipal and LIBOR rates were as highly correlated as represented in Presentation I. Plaintiffs assert that based on the data contained in Presentation II, the value of an investment in the Fund would have dropped by ten or more percent on six occasions between 2000 to 2007.

Plaintiffs acknowledge that Presentation I included the caveat that municipal bonds may underperform or outperform LIBOR hedges for several reasons and thus cause mark-to-market volatility, but nonetheless assert that Presentation I misrepresented the risk inherent in a Fund investment. Plaintiffs rely on the following statement, which directly followed the caveat described above: "These dislocations can cause mark-to-market volatility in a hedged municipal position, but they can also present relative value opportunities for skilled value managers." (Complaint ¶ 42.) Plaintiffs allege that Defendants' failure to provide an accurate portrayal of the pro forma mark-to-market volatility of the Fund prior to their investment in the FLNs constituted a material omission of fact.

Lastly, Plaintiffs allege that Presentation I fraudulently omitted the credit risk inherent in an FLN investment. Plaintiffs assert that municipal bonds are subject to credit risk, both related to the performance of the municipalities themselves and the possibility that the insurers of municipal debt offerings falter. Because Presentation I contains only boilerplate risk factors, Plaintiffs assert that Defendants also materially misrepresented this risk component of investment in the FLNs.

## II. DISCUSSION

### A. SUBJECT MATTER JURISDICTION

In reviewing the motion to dismiss, the Court will first address grounds that challenge its subject matter jurisdiction because, absent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further. *See Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000); *Can v. United States,* 14 F.3d 160, 162 n. 1 (2d Cir.1994) ("[I]n most instances the question whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider.").

### 1. Legal Standard

■ The inquiry on a motion to dismiss for lack of subject matter jurisdiction un-

der Rule 12(b)(1) concerns whether the district court has the statutory or constitutional power to adjudicate the case. *See Makarova*, 201 F.3d at 113. "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113. The preliminary showing that must be made by the plaintiff, however, is not meant to be overly burdensome, "allowing for subject matter jurisdiction so long as the 'the federal claim is colorable.' " *Cromer Fin. v. Berger*, 137 F.Supp.2d 452, 467 (S.D.N.Y. 2001) (*quoting Savoie v. Merchants Bank*, 84 F.3d 52, 57 (2d Cir.1996)); *see also Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 121 n. 1 (2d Cir.1998) ("[A] plaintiff ... should not be deprived of its day in an American court by a Rule 12(b)(1) order based on erroneous facts.... In a close case, the factual basis for a court's subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time." (citations and quotations omitted)). As noted above, in reviewing a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidence outside the pleadings. *See Banque Paribas*, 147 F.3d at 121 n. 1.

■ Although the Exchange Act is silent as to its extraterritorial application, federal courts have exercised subject matter jurisdiction over claims "implicating transnational securities fraud." *City of Edinburgh Council v. Vodafone Group Public Co.*, 2008 WL 5062669, at *2 (Nov. 24, 2008) (*citing SEC v. Berger*, 322 F.3d 187, 192 (2d Cir.2003)). Courts tasked with determining whether subject matter jurisdiction exists for transnational securities law claims must consider "whether Congress would have wished the precious resources of the United State courts ... to be devoted to such transactions." *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.2008), *cert. granted.* —— U.S. ——, 130 S.Ct. 783, —— L.Ed.2d —— (2009) (quotations and citations omitted). Specifically, courts in the Second Circuit engage in two inquiries to determine whether a district court may exercise subject matter jurisdiction over the claims of foreign plaintiffs arising out of transnational securities transactions: (1) whether the wrongful conduct occurred in the United States (the "Conduct Test"), or (2) whether the wrongful conduct, even if it occurred in a foreign country, had a substantial adverse effect in the United States or upon United States citizens (the "Effects Test"). *See Berger*, 322 F.3d at 192 (citations omitted). A plaintiff need only satisfy either the Conduct or the Effects Test to support a finding of subject matter jurisdiction. *See Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir.1983).

### 2. *Application*

Plaintiffs bring this action for securities fraud, alleging that Defendants fraudulently misrepresented the investment risk involved in the FLNs. Defendants move to dismiss Plaintiffs' claims, arguing that the Court lacks subject matter jurisdiction because Plaintiffs assert claims based on losses allegedly incurred in Norway, on securities arranged by a British bank, issued by Irish and French corporations and registered on an Irish exchange. Plaintiffs counter that Defendants' fraudulent statements that gave rise to this action were prepared in New York and thus satisfy the Conduct Test.[4]

■ The seminal formulation of the Conduct Test applicable in the Second Circuit is that enunciated in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.1975). The Second Circuit declared that the anti-fraud provisions of the federal securities laws "[d]o not apply to losses from sales of securities to foreigners outside the United States unless the acts (or culpable failures to act) within the United States directly caused such losses." *Bersch*, 519 F.2d at 993. Emerging from *Bersch* is a two-step analysis consistently employed by courts in this Circuit applying the Conduct Test. *See, e.g., In re NovaGold Res., Inc. Sec. Litig.*, 629 F.Supp.2d 272, 305 (S.D.N.Y. 2009); *Euro Trade*, 2002 WL 500672, at *7; *Interbrew v. Edperbrascan Corp.*, 23 F.Supp.2d 425, 430 (S.D.N.Y.1998). First, the conduct alleged must be more than "merely preparatory" to a securities fraud conducted elsewhere. *Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 122 (2d Cir.1995). Second, the "activities or culpable failures to act in the United States must have directly caused the claimed losses." *Id.* Inherent in the Conduct Test is the principle that Congress did not want "the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *Id.* (*citing Psimenos*, 722 F.2d at 1045).

The considerations enunciated in *Bersch*, though still routinely applied, have been recast over the years to address the myriad permutations and combinations of parties, places, timing and conduct that arise out of transnational securities fraud cases. *See In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 346, 371–73, 374 n. 17 (S.D.N.Y. 2005) ("Several other district courts have pronounced the standard for the conduct test in terms that may be broadly read as variations on the *Bersch* theme."). The *Bersch* doctrine has evolved to account for various considerations, including (1) the conduct in question in relation to plaintiff's theory of fraud; (2) the location of the relevant conduct; (3) the timeline of relevant acts; (4) the materiality or substantiality of the relevant conduct; (5) the causal connection between the domestic conduct and the alleged losses; and (6) considerations of "reasonableness gauged by the intent of congressional policy and principles of fairness in the circumstances surrounding the particular case." *Id.* at 375–76; *see also Tabor v. Bodisen Biotech. Inc.*, 581 F.Supp.2d 552, 558–63 (S.D.N.Y. 2008). But none of these considerations are meant to be weighed independently of the others; rather they must be considered in conjunction, and no particular consideration is dispositive. *See IIT, an Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 918 (2d Cir.1980) ("It should be evident by now that the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction ... is not necessarily dispositive in future cases" (quotations omitted)). Further, despite nuanced applications of the Conduct Test, the primary

---

4. The parties agree that the Effects Test is not applicable to the Court's determination of subject matter jurisdiction. As noted above, under the Effects Test, "a federal court has jurisdiction ... where illegal activity abroad causes a substantial effect within the United States." *Euro Trade & Forfaiting, Inc. v. Vowell*, No. 00 Civ. 8431, 2002 WL 500672, at *6 (S.D.N.Y. Mar. 29, 2002) (*citing Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.1991)). "The effects test concerns the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges," *Banque Paribas*, 147 F.3d at 128 n. 12, and it has no bearing in an action involving the claims of foreign purchasers of foreign securities on foreign exchanges, such as is the case presented here. The Court will therefore apply only the Conduct Test to determine whether it has jurisdiction.

inquiry remains the two-part determination articulated in *Bersch.* consisting of (1) whether the alleged domestic acts constitute the core of the alleged fraud, and (2) whether the acts directly caused the plaintiff's alleged losses. *See Morrison,* 547 F.3d at 173 ("To clear up any confusion, we reiterate that our 'conduct test' requires that 'the defendant's conduct in the United States be more than merely preparatory to the fraud, and [that] particular acts or culpable failures to act within the United States directly cause[ ] losses to foreign investors abroad' for subject matter jurisdiction to exist.") (*quoting Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991)); *see also Banque Paribas,* 147 F.3d at 128–29.

### a. The Heart of the Alleged Fraud Occurred in New York

■ A court determining its own subject matter jurisdiction must first analyze "what conduct comprises the heart of the alleged fraud." *Morrison,* 547 F.3d at 175. "This determination is made by enumerating and situating, according to place of occurrence, the pertinent material acts that, combined, constitute the alleged fraudulent scheme." *O'Mahony v. Accenture,* 537 F.Supp.2d 506, 513 (S.D.N.Y. 2008). If the acts that occurred in the United States are "merely secondary to the core acts of the fraud," they will not satisfy the conduct test. *City of Edinburgh Council,* 2008 WL 5062669, at *3 (*citing Banque Paribas,* 147 F.3d at 128–29). The Court will therefore analyze the submissions of the parties to determine whether Plaintiffs have shown by sufficient evidence that the heart of the fraud at issue in this action took place in the United States.

■ Defendants argue that, as in *Bersch,* the limited United States conduct identified by Plaintiffs was, at most, "merely preparatory and therefore cannot form the basis for subject matter jurisdiction." (Defs.' Oct. 7 Letter at 7.) Defendants assert that the essential core of the alleged fraud necessarily took place in Europe because the relevant transactions were negotiated and executed in Europe, the FLNs were issued in Europe, and the vast majority of communications occurred between Plaintiffs and CGM London. (*See* Arnold Decl. ¶¶ 4–12.) The Court disagrees. While Defendants are correct that conduct far removed from the consummation of the fraud will not suffice to establish jurisdiction, *see Psimenos,* 722 F.2d at 1046, the fraudulent misrepresentations and omissions alleged by Plaintiffs that constitute the fraud at issue specifically involve conduct undertaken in New York.

The parties have stipulated that Presentation I, which contains a majority of the alleged misrepresentations underlying Plaintiffs' securities fraud claims, was prepared by Defendants in New York. (*See* Origin of Various Documents at 1–2.) On this basis, in part, the Court is persuaded that the fraud alleged, taken as true, had its center of gravity in New York.

In essence, Plaintiffs allege that the Fund marketing strategy was concocted by CGM New York and CAI, both New York-based Citigroup entities, and that the strategy, replete with misinformation, misrepresentations and fraudulent omissions, was memorialized by Defendants in New York for transmission to potential investors. Any actions taken by CGM London or other Europe-based Citigroup entities to disseminate Presentation I and thus produce the losses claimed here arose directly from or were merely ancillary to Defendants' conduct in New York. *See Morrison,* 547 F.3d at 174 (discussing *Cromer,* 137 F.Supp.2d at 480, and stating "[t]he critical factor was that the conduct that directly caused loss to investors—the

creation of the fraudulent statements—occurred in New York.")

The chain of events and center of alleged fraudulent conduct at issue here are substantially analogous to the fact pattern addressed in *Cromer*. *See* 137 F.Supp.2d 452. There, the Court found it had subject matter jurisdiction in an action brought by foreign investors arising out of investments in an off-shore fund. *See id.* ("[A]lthough the named Plaintiffs are foreign citizens, and the Fund operated as an off-shore-fund, the fraud was run from the United States and it was the decisions made in the United States that led directly to the investors' losses.") The defendant investment manager had allegedly prepared fraudulent account statements in New York that vastly overstated the market value of an off-shore fund. The investment manager then sent the fraudulent statements to the fund administrator in Bermuda and directed him to distribute the statements to potential investors. As Defendants argue here, the investment manager in *Cromer* argued against subject matter jurisdiction under the Conduct Test because his actions in New York, even if true, did not directly cause the plaintiffs' losses because of intermediary steps taken to disseminate the information in Bermuda. The Court rejected the defendant investment manager's argument and denied his motion to dismiss for lack of subject matter jurisdiction. *See Cromer*, 137 F.Supp.2d at 480–81; *see also Berger*, 322 F.3d at 195 ("Although the statements that ultimately conveyed the fraudulent information to investors were prepared and mailed in Bermuda, the preparation and mailing of these inaccurate statements was not itself fraudulent: The Fund Administrator was simply acting under [the defendant's] instruction ... to distribute false information that he had already fraudulently concocted in the United States.")

The Court is persuaded that here, as in *Cromer*, the essential core of the alleged fraud occurred in New York. The Defendants concocted and implemented their allegedly fraudulent marketing strategy in New York. Irrespective of whether CGM London or another Citigroup entity ultimately disseminated Presentation I to Plaintiffs, Defendants' conduct occurring in New York constituted substantial acts committed in furtherance of the alleged fraud. *See Psimenos*, 722 F.2d at 1045 ("foreign plaintiffs' suits under anti-fraud provisions of the securities laws would be heard only when substantial acts in furtherance of the fraud were committed in the United States").

The chain of events and center of conduct in question here, as in *Cromer*, can be distinguished from the circumstances presented in other notable transnational securities fraud cases where the Second Circuit declined to find subject matter jurisdiction because the conduct in the United States was merely preparatory. *See, e.g., Morrison*, 547 F.3d at 176; *Bersch*, 519 F.2d at 987. In *Bersch*, parts of an allegedly fraudulent prospectus were drafted in New York and read over the telephone to a defendant corporation's main office in Switzerland. The Second Circuit declined to find jurisdiction over foreign plaintiffs' securities fraud claims arising out of defendants' New York-based contribution to the prospectus because "the fraud itself consisted of the delivery of the fraudulent prospectus to investors and the final prospectus emanated from foreign sources." *Morrison*, 547 F.3d at 173 (*citing Bersch*, 519 F.2d at 987).

Similarly, in *Morrison*, the Circuit Court reversed the district court's finding of subject matter jurisdiction where a defendant allegedly manipulated data in Florida and transmitted the false data to Australia, where it was compiled and prepared for

dissemination. The Second Circuit concluded that there was no subject matter jurisdiction, finding that the actions taken and not taken by the defendant in Australia were "significantly more central to the fraud and more directly responsible for the harm to investors than the manipulation of the numbers in Florida." *Id.* at 176.

By contrast, here, unlike in *Morrison* and *Bersch,* Defendants' alleged conduct in New York, if true, would represent the heart of the alleged fraud. Concocting a fraudulent marketing strategy and knowingly memorializing it in Presentation I for distribution by others abroad is significantly more culpable than CGM London's mere distribution of Presentation I, without any substantive changes, to potential investors. The Court is thus not persuaded that Defendants' conduct in New York was merely preparatory to the fraud. Rather, the Court finds that Defendants' conduct occurring in New York involved substantial acts committed in furtherance of the alleged fraud.

### b. *Plaintiffs Have Sufficiently Pled a Direct Causal Causation*

When reviewing for subject matter jurisdiction in a transnational securities fraud case, identification of the heart of the fraud is followed by analysis of whether the domestic conduct directly caused the alleged losses. As articulated in *Bersch,* the United States antifraud securities laws apply only to an alleged foreign fraudulent scheme if there is a sufficient connection between substantial domestic conduct and the consequential financial losses the plaintiff asserts. *See, e.g., Bersch,* 519 F.2d at 993; *In re Parmalat Sec. Litig.,* 497 F.Supp.2d 526, 531 (S.D.N.Y.2007); *In re Alstom,* 406 F.Supp.2d at 381.

Defendants assert that Plaintiffs have failed to allege that "the disclosure of the supposed misinformation led to their loss." (Defendants Letter in Support of Deemed Motion to Dismiss, dated October 21, 2009 ("Defs.' Oct. 21 Letter"), at 5.) Defendants urge the Court to apply the loss causation pleading standard set forth in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342–46, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) to this jurisdictional inquiry. But the Defendants misstate the applicable causation standard. At this stage in the proceedings, the Court need not determine whether disclosure of the alleged misrepresentations caused the Plaintiffs' losses. For the purpose of exercising subject matter jurisdiction, the Court need only determine whether the alleged fraud was an essential link in the chain of events culminating in the alleged fraud. *See Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1335 (2d cir.1972) (finding that an alleged misrepresentation was an "essential link" to the consummation of the transnational securities fraud). In other words, the injury asserted must be a direct result or reasonably probable consequence of the act or omission in question, and the alleged domestic conduct must have constituted a substantial factor or significant contributing cause in bringing about the alleged harm. *See In re Alstom,* 406 F.Supp.2d at 381.

■ The Court finds that Plaintiffs have pleaded sufficient facts alleging that Defendants' New York-based conduct was an essential link in the consummation of the alleged fraud at issue here. Plaintiffs' have sufficiently pled that their alleged losses were a direct result or reasonably probable consequence of Defendants' alleged misrepresentations. As noted above, in this jurisdictional analysis, the Court must determine only whether Plaintiffs have made out a colorable claim of securities fraud based on a center of conduct located in the United States. *See,*

*e.g., Cromer*, 137 F.Supp.2d at 467; *Savoie*, 84 F.3d at 57; *Banque Paribas*, 147 F.3d at 121 n. 1. The Municipalities have alleged that the dramatic divergence of the municipal and LIBOR rates shortly following their investment in the FLNs, in striking contrast to the representations contained in Presentation I, was the direct cause of their losses. (*See* Complaint ¶¶ 60–68.) Terra has similarly pled that its bankruptcy, resulting from the Municipalities' failed investment, was a reasonably probable consequence of Defendants' alleged fraud. (*See id.* ¶ 70.) The Court therefore finds that Plaintiffs have made out a colorable claim of securities fraud arising out of Defendants' allegedly fraudulent conduct in New York.

Accordingly, the Court finds that the Conduct Test is satisfied and Defendants' motion to dismiss on grounds of subject matter jurisdiction is denied.

## B. *FORUM NON CONVENIENS*

Defendants also move to dismiss Plaintiffs' complaint on forum non conveniens grounds. Courts in this Circuit employ a three-part test to analyze the application of forum non conveniens. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir.2005); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73–74 (2d Cir.2001) (en banc). The Court first determines the degree of deference that should be accorded the plaintiff's choice of forum. *See Norex Petroleum*, 416 F.3d at 153–54. Second, the court considers whether there exists an adequate and available alternative forum where the dispute could be adjudicated. *See Piper Aircraft v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Gulf Oil v. Gilbert*, 330 U.S. 501, 506–07, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Finally, the court assesses the appropriateness of litigating the action in the plaintiff's choice of forum, as opposed to any alternative venue, by balancing the private interests of the litigants and the public interest concerns of the court in accordance with the factors articulated by the Supreme Court in *Gilbert*. *See Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839; *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 500 (2d Cir.2002); *Turedi v. Coca Cola Co.*, 460 F.Supp.2d 507, 521 (S.D.N.Y.2006), *aff'd*, 343 Fed.Appx. 623 (2d Cir.2009). The inquiry probes whether, in the interests of justice and all other relevant concerns, the action would best be brought in another venue.

### 1. *Deference to Plaintiffs' Choice of Forum*

■ Generally, there is a strong presumption in favor of the plaintiff's choice of forum, particularly where the plaintiff is an American citizen. *See Piper Aircraft*, 454 U.S. at 250, 102 S.Ct. 252; *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir.2002); *Iragorri*, 274 F.3d at 70–71. However, where the plaintiffs are all foreign residents, and the circumstances indicate that the parties and material events bear no bona fide connection to the United States, the choice of forum is not entitled to special deference. *See Piper Aircraft*, 454 U.S. at 256, 102 S.Ct. 252. The degree of deference to be accorded a foreign plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations. *See Iragorri*, 274 F.3d at 71. Weighed in this analysis is the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice, as well as whether forum-shopping reasons may have motivated the plaintiff's choice. *See Pollux Holding Ltd. v. The Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir.2003) ("The greater the plaintiff's or the lawsuit's bona fide connection to the U.S., the more difficult it will be for the defendant to gain dismissal for forum non

conveniens."); *see also Iragorri,* 274 F.3d at 71–72; *Do Rosario Veiga v. World Meteorological Organization,* 486 F.Supp.2d 297, 302 (S.D.N.Y.2007).

Defendants argue that Plaintiffs' choice of forum is entitled to minimal or no deference because they are all residents of Norway and their choice was motivated by forum-shopping reasons. (*See* Defs.' Oct. 7 Letter at 3; Defs.' Oct. 21 Letter at 2.) While it is true that foreign plaintiffs are not accorded the same degree of deference as American plaintiffs, where there are legitimate reasons for bringing suit in this jurisdiction, foreign plaintiffs' choice of forum may still be entitled to deference. *See, e.g., Bigio v. Coca–Cola Co.,* 448 F.3d 176, 179 (2d Cir.2006) ("The more that a plaintiff, even a foreign plaintiff, chooses to sue in a United States court for 'legitimate reasons,' the more deference must be given that choice." (*quoting Iragorri,* 274 F.3d at 73)); *Pollux Holding,* 329 F.3d at 71. The Court will apply the *Iragorri* sliding-scale analysis to determine the degree of deference to be accorded Plaintiffs' choice.

Defendants assert that Plaintiffs' choice of forum was motivated by forum-shopping reasons. (*See* Defs.' Oct. 7 Letter at 3–4.) In support, Defendants cite a Norwegian news article in which Skjorshammer, the executor of the Terra bankruptcy estate, states, "American law is very plaintiff friendly." (Declaration of Alastair Wood, dated October 21, 2009 ("Wood Decl."), Ex. 8.) Skjorshammer's statement, made at a press conference focusing on the costs that Terra's estate would incur through litigation, refers to the low likelihood, compared to other jurisdictions, that losing parties in United States civil litigation will be ordered to pay their opponents legal expenses. (*See* Wood Decl., Ex. 8; Reply Declaration of Skjorshammer, dated October 27, 2009, ¶ 2.)

Defendants also rely on a memorandum prepared in August 2008 (the "Narvik Assessment") by the administrative advisor of Narvik (the "Narvik Advisor"), one of the Municipalities. (*See* Wood Decl. 10, Ex. 10.) After considering the relative merits of suit in the United States, as opposed to England or Norway, the Narvik Advisor concludes that Narvik should not engage American law firms "at the present time" for the purpose of bringing suit against Citigroup in the United States, despite the opportunity to retain an American firm on a contingency fee basis. (*Id.*) The Narvik Advisor's recommendation was based on a finding by English attorneys that "any possible legal action against Citibank most probably will have to take place according to English or Norwegian law— and *not* American law." (*Id.*)

The availability of contingency fees and the low likelihood of having to pay opposing counsel's legal fees both represent comparative tactical advantages afforded by United States civil litigation. The evidence submitted by Defendants thus indicates, at least as to Terra and the municipal corporation of Narvik, that forum-shopping reasons may have motivated the choice of this forum. But for the Court to accord Plaintiffs' choice of forum minimal or no deference on this basis would belie the sliding-scale principle of the *Iragorri* analysis. Among the reasons for the sliding-scale analysis are the practical realities of cross-border disputes. *See In re Air Crash Near Peixoto De Azeveda Bra.,* 574 F.Supp.2d 272, 279 (E.D.N.Y.2008). In a dispute with connections to multiple jurisdictions, plaintiffs will understandably choose a forum based on numerous considerations, including any potential advantage a particular forum affords. Further, although the Narvik Assessment evidences Narvik's consideration of contingency fees in its decision to forego retaining Ameri-

can counsel in August 2008, such consideration does not necessarily implicate contingency fees as the reason why Narvik, or any of the other Municipalities, ultimately brought suit in this jurisdiction in August 2009.

■ Defendants correctly assert that a plaintiff's choice of a defendant's home forum, over another forum where a defendant is amenable to suit and to which the plaintiff and the case are much more closely connected, often suggests forum-shopping. But here, despite any connections between the relevant transactions and other fora, this action also possesses bona fide connections to New York, Plaintiffs' chosen forum. *See Pollux Holding*, 329 F.3d at 74 ("[A] plaintiff's choice to initiate suit in the defendant's home forum—as opposed to any other where the defendant is also amenable to suit—only merits heightened deference to the extent that the plaintiff and the case possess bona fide connections to, and convenience factors favor, that forum."). Where a case, such as this one, bears a bona fide connection to the defendant's home forum, evidence of tactical forum-shopping does not necessarily result in minimal or no deference. The sliding scale analysis distinguishes between a plaintiff's legitimate right to select a forum and mere forum-shopping that is designed to burden the defendants. *See Iragorri*, 274 F.3d at 72.

Here, the Court finds that Plaintiffs have legitimate reasons for bringing suit in this jurisdiction. As described above in the Conduct Test analysis, the essential core of Defendants' allegedly fraudulent acts in furtherance of the alleged fraud were committed in New York. Neither the Narvik Advisor's assessment of the merits of potential claims under American law, nor's statement to the press, undermines this jurisdictional fact.

While the Court is persuaded that forum-shopping reasons may have, to a certain extent, motivated Plaintiffs' choice of forum, the Court is also mindful of Plaintiffs' legitimate reasons for bringing suit in this jurisdiction. Accordingly, though not entitled to full deference, the Court nonetheless finds that Plaintiffs' choice of forum is entitled to some deference.

2. *Availability of an Adequate Alternative Forum*

■ The adequate alternative forum requirement of the forum non conveniens doctrine is ordinarily satisfied if (1) the other forum is available because the defendant is amenable to service of process there, and (2) the forum permits litigation of the "subject matter of the dispute and offers remedies for the wrongs the plaintiff alleges, even if the causes of action and relief available there are not identical in every respect to the claims and relief the plaintiff seeks in his chosen forum." *Do Rosario Veiga*, 486 F.Supp.2d at 303 (*citing Monegasque*, 311 F.3d at 499); *see also Capital Currency Exch. v. National Westminster Bank PLC*, 155 F.3d 603, 610 (2d Cir.1998).

Defendants assert that both England and Norway are adequate alternative forums. Defendants submit that they would consent to service of process in either Norway or England. (*See* Defs.' Oct. 7 Letter at 4.) Further, Defendants assert that both England and Norway permit suit for the types of fraud-based claims asserted here, and have been found to be adequate forums for the adjudication of civil disputes.

■ Upon review of the submissions by both parties, the Court is persuaded that both Norway and England present alternative and adequate forums for the adjudication of this dispute. Federal circuit courts have found both Norway and England to be adequate forums for the

adjudication of civil disputes, *see Pollux Holding*, 329 F.3d at 75 (England), *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir.2000) (Norway), and Defendants represent that they would consent to service of process in both countries, which satisfies the alternative forum requirement. *See Turedi*, 460 F.Supp.2d at 524. Further, the Court is persuaded that both forums offer remedies for the wrongs Plaintiffs allege. (*See* Declaration of Finn Myhre, dated October 21, 2009, ¶¶ 7–13; Declaration of Stephen Moriarty QC in Support of Defendants' Motion to Dismiss, dated October 19, 2009 ("Moriarty Decl."), ¶¶ 5–21.) Plaintiffs argue that, just as in this forum, an English court could dismiss on forum non conveniens grounds. (*See* Plaintiffs' Reply Letter, dated October 14, 2009, at 4 (*citing* Declaration of Felicity Toube, dated October 13, 2009, ¶¶ 5, 7).) However, the Court is persuaded that the prospect contemplated by Plaintiffs could only occur if the Defendants were to dispute an English court's jurisdiction. (*See* Moriarty Decl. ¶ 13.) Because Defendants represent that they would consent to jurisdiction in England, Plaintiffs' argument is without merit.

Accordingly, the Court finds both Norway and England to be adequate and alternative forums.

### 3. *Public and Private Interest Factors*

■ Where a plaintiff's choice of forum is entitled to deference, the Supreme Court has recognized that dismissal may nevertheless be appropriate where certain private and public interest considerations weigh in favor of adjudication in an adequate alternative forum. *See Piper Aircraft*, 454 U.S. at 255, 102 S.Ct. 252; *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839. The burden of demonstrating that a lawsuit would be more appropriately adjudicated in another forum is on the defendant seeking dismissal. *See Wiwa v. Royal Dutch Petroleum*, 226 F.3d 88, 100 (2d Cir.2000).

■ The private and public interest considerations enumerated in *Gilbert* include: (1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) practical problems involving the efficiency and expense of a trial; (5) enforceability of judgments; (6) administrative difficulties flowing from court congestion; (7) imposing jury duty on citizens of the forum; (8) the local interest in having controversies decided at home; and (9) the avoidance of the unnecessary application of foreign law. *See Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839.

*Gilbert* instructs reviewing courts to disturb a plaintiff's choice of forum only where the balance of private and public interest considerations "strongly" favors the moving defendant. *DiRienzo*, 294 F.3d at 30–31 (*citing Gilbert*, 330 U.S. at 508, 67 S.Ct. 839). Here, the Court is not persuaded that the *Gilbert* considerations weigh strongly in favor of dismissal. Defendants urge the Court to dismiss Plaintiffs' suit because the vast majority of contacts between Plaintiffs and Defendants occurred in Europe; all of Plaintiffs' witnesses and documentary evidence are in England; Norway has a significant local interest in the dispute; the courts of Norway and England are comparatively less congested than this Court; and New York's citizens should not be burdened with jury service in this litigation. (*See* Defs.' Oct. 7 Letter at 5; Defs.' Oct. 21 Letter at 3–4.)

After considering Defendants' arguments, as well as countervailing facts weighing in favor of exercising jurisdiction, the Court concludes that Defendants have not shown that the *Gilbert* private interest considerations weigh strongly in

favor of dismissal. Even assuming that a majority of the relevant evidence is in Europe, as Defendants contend, Defendants have offered no reason why transporting any evidence to New York would pose any significant hardship to the parties. *See DiRienzo*, 294 F.3d at 30 ("To the extent documents exist [overseas], advances in transportation and communication accord this issue less weight."); *Cyberscan Tech. v. Sema Ltd.*, No. 06 Civ. 526, 2006 WL 3690651, at *10 (S.D.N.Y. Dec. 13, 2006). Further, although several witnesses reside in Europe, Plaintiffs have identified numerous significant New York-based witnesses most intimately involved in and knowledgeable about the alleged fraudulent acts taken in New York, (*See* Skjorshammer Decl. ¶ 22), and Defendants have not identified any Europe-based witnesses as unwilling or unable to appear in this Court. *See Cyberscan*, 2006 WL 3690651 at *10 (*quoting Haywin Textile Prods., Inc. v. International Fin. Inv.*, 137 F.Supp.2d 431, 436 (S.D.N.Y.2001) ("Such identification is generally required for a forum non conveniens dismissal.")).

As to the public interest considerations, while this litigation is indeed a dispute with great local interest in Norway, and the Southern District of New York is undoubtedly a heavily-congested court, these considerations are not sufficient to warrant dismissal. As courts in this Circuit have consistently recognized, "Congress did not want to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *Psimenos*, 722 F.2d at 1045; *IIT v. Vencap*, 519 F.2d 1001, 1017 (2d Cir.1975); *In re Alstom*, 406 F.Supp.2d at 383. As detailed above, the core operative facts underlying Plaintiffs' federal securities fraud claims arise from New York-based conduct. The Southern District of New York is therefore the forum with the most sig-

nificant contacts with, and the greatest interest in, the adjudication of this dispute. *See Corporacion v. Schumacher*, 418 F.Supp.2d 529, 536 (S.D.N.Y.2006).

The Court concludes that the balance of the *Gilbert* private and public interest factors do not weigh strongly in favor of dismissal. The Defendants have failed to show that "the chosen forum is ... genuinely inconvenient and the [alternative] forum[s] significantly preferable." *Bigio*, 448 F.3d at 179 (citation and quotation omitted). Accordingly, Defendants' motion to dismiss for forum non conveniens is denied.

## IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion to dismiss (Docket No. 8) of defendants Citigroup, Inc., Citigroup Global Markets, Inc. and Citigroup Alternative Investments LLC is DENIED.

**SO ORDERED.**